247 N.J. Super. 186 (1991)
588 A.2d 1248
IN RE PETITION FOR SUBSTANTIVE CERTIFICATION FILED BY THE TOWNSHIP OF DENVILLE.
Superior Court of New Jersey, Appellate Division.
Argued October 17, 1990.
Decided March 26, 1991.
*190 Before Judges SHEBELL, HAVEY and SKILLMAN.
Stephen Eisdorfer, Assistant Deputy Public Advocate, argued the cause for appellants Morris County Branch of the N.A.A.C.P. and the Public Advocate (Wilfredo Caraballo, Public Advocate, attorney; Stephen Eisdorfer on the briefs).
Geraldine Callahan, Deputy Attorney General, argued the cause for respondent Council on Affordable Housing (Robert J. Del Tufo, Attorney General, attorney; Michael R. Clancy, Assistant Attorney General, of counsel; Geraldine Callahan and Donald M. Palombi, Deputy Attorney General, on the brief).
Stephan C. Hansbury argued the cause for respondent Township of Denville (Hansbury, Martin & Knapp, attorneys; and relied upon the brief filed by the Attorney General).
Appellant Cali Associates has not filed a brief but will rely on the brief submitted by the Public Advocate.
The opinion of the court was delivered by HAVEY, J.A.D.
In this Mount Laurel litigation, the Public Advocate, on his own behalf and on behalf of the Morris County Fair Housing Council and Morris County Branch of the N.A.A.C.P., appeals from a grant of substantive certification by the Council on Affordable Housing (COAH) approving the Township of Denville's housing element and fair share plan. Appellants had filed an action in the Law Division against Denville claiming that the township's zoning violated the Mount Laurel[1] mandate *191 that it provide its fair share of low and moderate income housing. The matter was transferred from the Law Division to COAH following the Supreme Court's decision in Hills Dev. Co. v. Township of Bernards, 103 N.J. 1, 510 A.2d 621 (1986). While Denville's fair share plan was pending before COAH, appellant Cali Associates moved for a builder's remedy which COAH denied. Cali appeals from that denial and joins in the arguments raised by the Public Advocate. We have consolidated the appeals for purposes of this opinion.
The Public Advocate has raised an array of challenges to Denville's plan. However, the single contention addressed here is that COAH should have rejected Denville's proposed 201-unit development because the development is made up of all low and moderate income housing units and is "isolated" from other residential communities in Denville. According to the Public Advocate, this component of Denville's fair share plan will result in a "ghetto" of poor people and racial minorities, contrary to the Fair Housing Act of 1985 (FHA), N.J.S.A. 52:27D-301 to -329 state and federal civil rights laws and the federal and New Jersey constitutions. We hold that a development consisting of all Mount Laurel units is sustainable under the FHA. However, we remand to COAH for a determination as to the suitability of the proposed site for Mount Laurel housing.
Denville, a suburban municipality located in the northcentral section of Morris County, is part of the Northwest Housing Region, consisting of Essex, Morris, Sussex and Union Counties. See N.J.A.C. 5:92-2.1. In 1980, Denville had a population of 14,380. Blacks and Hispanics make up 1.1 percent of the population of the township and 64.1 percent of the low and moderate income households of the region.
COAH assigned Denville a fair share of 417 units, 31 representing indigenous need and 386 representing the present and *192 prospective fair share of the region's need. Denville's plan, approved by COAH, includes a request for a 29-unit credit for rehabilitated units; the construction of 201 rental, low and medium income units on a 40-acre site in Denville; a regional contribution agreement (RCA) with Newark for the construction or rehabilitation of 136 units, an RCA with Boonton for the construction of 38 units, and a rental bonus credit of 13 units.[2]
The 201-unit development, pertinent here, will consist of all low and moderate income units constructed on the "McGreevy" site, a 40-acre tract purchased by the township. Seventy-five units will be constructed by the Morris County Housing Authority under a $5.4 million grant from the Federal Housing and Urban Development Agency, and 126 rental units by St. Francis Lifecare, Inc. The proposed development will be subject to an "occupancy preference" under which 50 percent of the units are reserved for those who live or work in Denville. See N.J.A.C. 5:92-15.1.
On appeal, the Public Advocate raises the following points:

Point I  In determining whether to grant Denville Township's petition for substantive certification, the Council is obligated to determine not only whether the municipal housing element and fair share plan complies with the Council's own regulations and policies, but also whether it violates the New Jersey Constitution as construed in the Mt. Laurel decisions, the Fair Housing Act of 1985 and the relevant state and federal civil rights laws.

Point II  By failing to render specific findings of fact and conclusions of law and by failing to grant an evidentiary hearing on controverted issues, the Council violated principles of procedural fairness and due process and the requirements of the Fair Housing Act and the Administrative Procedure Act.

Point III  The Council unlawfully approved the housing element and fair share plan submitted by Denville Township which perpetuates exclusionary zoning in violation of the New Jersey Constitution and the Fair Housing Act of 1985.

Point IV  The housing element and fair share plan submitted by Denville Township constitutes illegal racial discrimination and therefore could not lawfully be approved by the Council on Affordable Housing.

*193 A. The plan submitted by Denville Township incorporates criteria for selection of occupants of lower income housing that constitutes unlawful racial discrimination.
B. The plan submitted by Denville Township incorporates Regional Contribution Agreement between Denville Township and Newark that constitutes unlawful racial discrimination.
C. The various components of Denville Township's plan, taken together, have a magnified racially discriminatory effect.

Point V  The Council unlawfully approved the housing element and fair share plan submitted by Denville Township which creates an isolated and insular "ghetto" of poor people and racial minorities in violation of the New Jersey Constitution and the Fair Housing Act of 1985 and state and federal civil rights laws.

Point VI  Because it does not provide one housing unit in the receiving municipality for each unit credited to the sending municipality, the proposed Regional Contribution Agreement between Denville and Boonton violates the Fair Housing Act and the New Jersey Constitution and could not lawfully be approved by the Council.
The contentions raised in Points I through IV challenge the "residency preference" and Newark-RCA components of Denville's plan. We reject the contentions substantially for the reasons expressed in our opinion in In re Petition for Substantive Certification filed by the Township of Warren, 247 N.J. Super. 146, 588 A.2d 1227 (App.Div. 1991).
In Point V, the Public Advocate argues that Denville's "100-percent lower income project to be located [on] a single 40-acre site," which is "isolated" from other residential developments, will result in an "insular enclave of poor people and racial minorities." The Public Advocate asserts that if the occupants of the development "fairly reflect" the racial makeup of the low and moderate income population of the region, the development will have a population that is 64.1 percent black and Hispanic. Such a development, it is argued, is contrary to "sound regional planning" and in violation of state and federal civil rights laws and the federal and New Jersey constitutions.

I
We do not agree with the Public Advocate that COAH was required to reject Denville's proposal because of the potential *194 for an undue concentration of minorities. The Mount Laurel doctrine was conceived in order to dismantle economic barriers resulting from exclusionary zoning, which effectively deprived the poor of realistic housing opportunity. Mount Laurel I, supra, 67 N.J. at 173-87, 336 A.2d 713. In order to "put some steel" into that doctrine, the court in Mount Laurel II devised a mechanism to enforce each municipality's constitutional obligation to provide "a realistic opportunity for the construction of its fair share of the present and prospective regional need for low and moderate income housing." 92 N.J. at 200, 205, 456 A.2d 390. Thus, the doctrine's primary focus is to cure economic discrimination, not to assure that the cure results in economic or racial balance. In accomplishing that mission, Mount Laurel is essentially race-neutral.[3]
The FHA, the legislative response to the Mount Laurel problem, carries out the Supreme Court's mandate. N.J.S.A. 52:27D-301 to -329. Under the FHA, COAH is empowered to create a regulatory scheme by which it determines whether a municipality's proposed housing element creates a realistic opportunity for the construction of affordable housing, consistent with its constitutional obligation. See N.J.S.A. 52:27D-302, -303, -307. Thus, COAH's primary focus is not on the racial makeup of the probable occupants of Mount Laurel housing, but whether the plan adheres to sound regional planning and satisfies the constitutional obligation "enunciated by the Supreme Court." N.J.S.A. 52:27D-303.
*195 In any event for the reasons expressed in our opinion in In re Petition for Substantive Certification filed by the Township of Warren, supra, 247 N.J. Super. at 165-170, 588 A.2d at 1237-1239, we reject the Public Advocate's assertion that Denville's plan violates the equal protection clauses of the federal and New Jersey constitutions, the Law Against Discrimination, N.J.S.A. 10:5-1 to -42, and the federal Fair Housing Act, 42 U.S.C.A. §§ 3601 to 3631. There is no showing here of a discriminatory intent in Denville's scheme, thus foreclosing any finding that there has been a violation of the Equal Protection Clause of the Fourteenth Amendment or N.J. Const. art. I, §§ 1, 5. See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 562-63, 50 L.Ed.2d 450, 463-64 (1977); Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249, 285 (1976), (reprinted in corrected form at 80 N.J. 6, 364 A.2d 1016), appeal dismissed and cert. den. 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977).
The argument that the Fair Housing Act, 42 U.S.C.A. §§ 3601 to 3631, will be violated if the proposed development is approved must also be rejected. The Public Advocate's argument that the development will result in a "ghetto" of racial minorities is at best speculative. There simply is no basis to conclude that since 64.1 percent of the region's low and moderate income families are minorities, Denville's development will contain a similar percentage of minorities. Denville has a 1.1 percent black and Hispanic population. The limited experience to date has demonstrated that most residents of Mount Laurel housing come from the same or nearby municipalities. See Lamar, Mallach & Payne, Mount Laurel at Work: Affordable Housing in New Jersey, 1983-1988, 41 Rutgers L.Rev. 1197, 1257 (1989). It therefore seems highly doubtful that the Public Advocate's hypothesized percentage of minority households that will reside in the development will be a reality.
*196 Moreover, even if a prima facie case of discriminatory effect is established, we are satisfied that COAH's approval of the plan advances a legitimate governmental interest and "no alternative would serve that interest with less discriminatory effect." In re Petition for Substantive Certification filed by the Township of Warren, supra, 247 N.J. Super. at 169, 588 A.2d at 1239 (quoting Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 936 (2d Cir.), aff'd on other grounds, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988)). A development of all Mount Laurel units clearly best serves the governmental interest and advances the statutory purpose of providing affordable housing to the poor.

II
A municipality, in satisfying its allocated share, may submit a housing element and fair share plan to COAH and petition for substantive certification. N.J.S.A. 52:27D-313. The FHA provides COAH with broad powers, including the power to grant or deny substantive certification in a "multitude of ways" in order to achieve statewide compliance with the Mount Laurel obligation. Van Dalen v. Washington Tp., 120 N.J. 234, 245, 576 A.2d 819 (1990) (quoting Hills Dev. Co. v. Township of Bernards, supra, 103 N.J. at 56, 510 A.2d 621). A COAH-certified plan is accorded presumptive validity in exclusionary zoning cases against the municipality. N.J.S.A. 52:27D-317a. COAH's exercise of statutorily delegated responsibility "is accorded a strong presumption of validity and reasonableness," Van Dalen v. Washington Tp., supra, 120 N.J. at 244-45, 576 A.2d 819, as is its interpretation and application of the FHA. See Holmdel Builders Ass'n v. Township of Holmdel, 121 N.J. 550, 574, 583 A.2d 277 (1990).
Implicit in the Public Advocate's challenge to Denville's proposed development is that a project which contains all Mount Laurel units violates the spirit of Mount Laurel and the FHA because it invites economic imbalance. However, *197 nothing in the FHA compels the inclusion of affordable and market-rate units in a single development. To the contrary, a municipality may provide its fair share of affordable units "by means of any technique or combination of techniques" which satisfies its Mount Laurel obligation. N.J.S.A. 52:27D-311a (emphasis added). Under N.J.S.A. 52:27D-304f an "inclusionary development" must at a minimum contain a "substantial percentage" of Mount Laurel units; the statute does not preclude a development consisting of all such units. Indeed, COAH's own regulation defines "inclusionary development" as including "housing developments comprised completely of low and moderate income units." N.J.A.C. 5:92-1.3 (emphasis added). Such a scheme is no different than most if not all federally subsidized housing projects.
The fact that a development may be occupied by all poor people may well foster rather than frustrate the Mount Laurel mandate, that the poor be given a realistic housing opportunity. The project is of particular benefit in eradicating economic discrimination when, as here, it provides a substantial number of rental units, a source of housing most affordable to the very poor.[4]See Mount Laurel I, supra, 67 N.J. at 171, 336 A.2d 713.
Moreover, in accepting the development, COAH recognized the practical difficulties Denville faced in building a complex with both affordable and market-rate units. Such a development, constructed by the private sector, might have included as many as 800 market-rate units in order to generate the 201 low and moderate income units proposed by Denville. See N.J.A.C. 5:92-8.4(c). The municipality rejected such a scheme because it desired to preserve existing sewer and water resources and to *198 minimize the impact such a substantial development would have on its infrastructure. Denville's proposal is a rational alternative to such a substantial inclusionary development. The proposed development is therefore fully sustainable under the FHA.

III
Although we hold that an all Mount Laurel unit development is sustainable under the FHA, we agree with the Public Advocate that when such a development is proposed, COAH must determine the suitability of the site in light of the Mount Laurel mandate and purposes of the FHA. Mount Laurel I and II do not expressly address the question of the "suitability" of a site for Mount Laurel housing. Mount Laurel II holds that once a municipality has revised its land use regulation and taken other steps affirmatively to provide a realistic opportunity for affordable housing, "the Mount Laurel doctrine requires it to do no more." 92 N.J. at 260, 456 A.2d 390. The court emphasized that "Mount Laurel is not an indiscriminate broom designed to sweep away all distinctions in the use of land," and that municipalities may continue to zone for upper-income housing and "may continue to require certain community amenities in certain areas, may continue to zone with some regard to their fiscal obligations: they may do all of this, provided that they have otherwise complied with their Mount Laurel obligations." Id. In other words, the Mount Laurel doctrine was not intended to dictate where, within a community, a Mount Laurel development should be situated.
However, the court noted that "specific location of such housing will of course continue to depend on sound municipal land use planning." Id. at 211, 456 A.2d 390 (emphasis added). Moreover, it suggests that reasonable access to community service, may be an important factor in site selection:
[w]here set-asides are used ... municipalities . .. should attempt to assure that lower income units are integrated into larger developments in a manner that both provides adequate access and services for the lower income residents *199 and at the same time protects as much as possible the value and integrity of the project as a whole.

Id. at 268, n. 32, 456 A.2d 390 (emphasis added). Although the comment has limited application here because it is made in the context of mandatory set-asides within an inclusionary development, it implies that some consideration must be given to "adequate access and services for the lower income residents" within the community as a whole in considering the suitability of a site for Mount Laurel development.
Other pre-FHA cases have focused on the "suitability" of the site in the context of compliance with Mount Laurel and sound zoning concepts. For example, Judge Serpentelli in Allan-Deane Corp. v. Township of Bedminster, 205 N.J. Super. 87, 115, 500 A.2d 49 (Law Div. 1985), noted that a factor in site selection, as part of the compliance procedure, is a review of "site suitability," which relates to:
the physical appropriateness of the parcel. Such factors as environmental suitability, availability of infrastructure, proximity to goods and services, regional accessibility and compatibility with neighboring land uses may impact upon whether the court finds a parcel suitable for Mount Laurel development.
The FHA and its attendant regulations embrace this theme of "suitability." The Legislature declares that "the statutory scheme ... is in the public interest in that it comprehends a low and moderate income housing planning and financing mechanism in accordance with regional considerations and sound planning concepts which satisfies the constitutional obligation enunciated by the Supreme Court." N.J.S.A. 52:27D-303 (emphasis added). The FHA directs COAH to carry out its statutory duties "in accordance with sound regional planning[.]" N.J.S.A. 52:27D-304a.[5] The interest of all citizens *200 "including low and moderate income families in need of affordable housing" are best served by a "comprehensive planning and implementation response" to these constitutional obligations. N.J.S.A. 52:27D-302c. In order to "achieve the goal of access to affordable housing to meet present and prospective housing needs, with particular attention to low and moderate income housing," N.J.S.A. 52:27D-310, a municipality's housing element shall contain a "consideration of the lands that are most appropriate for construction of low and moderate income housing... including a consideration of lands of developers who have expressed a commitment to provide low and moderate income housing." N.J.S.A. 52:27D-310f (emphasis added).
COAH's regulations require municipalities to establish priorities for low and moderate income sites. See N.J.A.C. 5:92-9.1(a). Sites should be "available, suitable, developable and approvable as defined in N.J.A.C. 5:92-1.3." Id. "Available site" is one with clear title free of encumbrances which preclude development of low and moderate income housing. N.J.A.C. 5:92-1.3. A "suitable site" is defined as "a site that is adjacent to compatible land uses, has access to appropriate streets and is consistent with the environmental policies delineated in Sub-chapter 8, Municipal Adjustments." Id. (emphasis added). "Developable site" is defined as a site having access to appropriate water and sewer infrastructure, and "approvable site" as a site that may be developed for low and moderate income in a manner "consistent with the regulations of all agencies with jurisdiction over the site." Id.
Implicit in these legislative and regulatory directives is that amendments to the master plan and zoning ordinances, necessary to implement a housing element and fair share plan, must *201 not only be consistent with the FHA and COAH regulations, but with "sound municipal land use planning," Mount Laurel II, supra, 92 N.J. at 211, 456 A.2d 390; that is, with the purposes of the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -129. Such purposes include the appropriate use or development of land in a manner which promotes the public health, safety, morals and general welfare, N.J.S.A. 40:55D-2a, and the establishment of appropriate population densities and concentrations that will contribute to the "well-being of persons, neighborhoods, communities and regions and preservation of the environment[.]" N.J.S.A. 40:55D-2e. Also, the zoning scheme must provide "sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open space, ... in order to meet the needs of all New Jersey citizens[.]" N.J.S.A. 40:55D-2g (emphasis added).
COAH must therefore focus on the "suitability" of the site in its review of a fair share plan component, consistent with its own regulations and sound planning concepts. Of course in doing so, COAH must be mindful of the presumption of validity afforded the zoning ordinance adopted by the municipality. See Lusardi v. Curtis Point Property Owners Ass'n, 86 N.J. 217, 226, 430 A.2d 881 (1981); Bow & Arrow Manor, Inc. v. Town of West Orange, 63 N.J. 335, 343, 307 A.2d 563 (1973).
Here, COAH made no findings with respect to the "suitability" of the "McGreevy" tract. Indeed, the record is sparse regarding the characteristics of Denville's overall land use. Absent is any evidence of the availability of recreational and governmental facilities at or near the proposed site. All we know is that the "McGreevy" tract has access to Route 10, with a secondary access by way of Smith Road and that the site is affected by wetlands and excessive sloping. We know nothing about the availability to the proposed site of facilities such as schools, churches, public and private recreational facilities, public transport, community services, or proximity of the site to *202 other goods and services. We also know nothing about the compatibility of the site with neighboring land uses, N.J.A.C. 5:92-1.3, or whether the site is one of the parcels in Denville's available land inventory that is "most appropriate for construction of low and moderate income housing[.]" N.J.S.A. 52:27D-310f. In short, a remand to COAH is necessary for comprehensive fact-findings as to "suitability" of the proposed site in the context of sound planning concepts. COAH should make the threshold determination as to whether an evidentiary hearing before the Office of Administrative Law is mandated. See Hills Dev. Co. v. Township of Bernards, 229 N.J. Super. 318, 340-41, 551 A.2d 547 (App.Div. 1988).

IV
In Point VI the Public Advocate challenges Denville's RCA with Boonton which provides for a transfer of 38 units to Boonton at a cost to Denville of $570,000, or $15,000 per unit. As stated, Boonton has declined to enter into the RCA. The issue is therefore moot. See Sente v. Mayor of Clifton, 66 N.J. 204, 208-09, 330 A.2d 321 (1974).
Affirmed in part, reversed and remanded in part.
SHEBELL, J.A.D., concurring in part and dissenting in part.
I concur in the decision of my colleagues on all issues except that of the occupancy preference. On that issue I dissent for the reasons expressed in my dissenting opinion in In re Petition for Substantive Certification filed by the Township of Warren, 247 N.J. Super. 146, 588 A.2d 1227.
NOTES
[1] Southern Burlington Cty. NAACP v. Township of Mount Laurel, 67 N.J. 151, 336 A.2d 713 appeal dismissed and cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mount Laurel I); Southern Burlington Cty. NAACP v. Township of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983) (Mount Laurel II).
[2] We were advised since oral argument that Boonton has declined to enter into the RCA with Denville. Denville has an alternative plan "without RCAs." It is unclear to what extent the other approved components will be affected by abandonment of the Boonton RCA.
[3] We are mindful of our Supreme Court's admonition in Oakwood at Madison, Inc. v. Township of Madison, 72 N.J. 481, 548, 371 A.2d 1192 (1977), that "[i]t goes without saying that the statutory and constitutional prohibition, by judicial construction, of zoning to exclude, encompasses exclusion by race as well as by economic circumstances." However, the component challenged here has no capacity to exclude by race. To the contrary, the development provides a realistic housing opportunity to all low and moderate income families of all races.
[4] According to the 1980 Census, rental housing makes up only 12.2 percent of the municipality's housing stock. Of the low-income households who were renting in 1980, 85.1 percent were obligated to pay more than 35 percent of their total income for rent. N.J. State Data Center, Gross Rent and Monthly Owner Housing Costs: 1980 Census 383 (1982).
[5] In Mount Laurel II the Supreme Court applied the concept of "sound regional planning" in the context of identifying "growth" areas for the purpose of imposing the Mount Laurel obligation. 92 N.J. at 225-27, 456 A.2d 390. The court utilized the State Development Guide Plan (SDGP), promulgated pursuant to N.J.S.A. 13:1B-15.52 (repealed by N.J.S.A. 52:18A-199), as representing a statewide "blueprint" for future development. Id. at 226, 456 A.2d 390. By using "sound planning concepts" the plan collated data from various studies regarding current and future growth, inventory of the State's "physical assets" and such factors as natural resources, open spaces and infrastructure. Id. at 225, 456 A.2d 390. COAH relies on the SDGP in determining the location and size of growth areas. See N.J.A.C. 5:92-1.3; see also Van Dalen v. Washington Tp., supra, 120 N.J. at 244, 576 A.2d 819.